Thank you, Your Honor. Good morning. Good morning. May I begin? Please. I just want to give a little context to this case. I was trial counsel for Mr. Young. This case, the genesis of this case, was an investigation originally by the federal government of members of the Nevada Department of Corrections. They believed that there was misconduct with guards and later we found out there were because there were prosecutions after our trial. Now, the government in their brief concedes the fact that they committed a violation that they should have turned over information that Michael Alvarez was involved in an operation with state officials involving drugs. And why is that important? It's important because the cornerstone of their, the theory of their prosecution at trial was that Robert Young was a drug trafficker within the prison system up at Ely State Prison. Well, after the trial, I find out and I filed the appropriate motions that the state didn't tell me that Michael Alvarez was involved with guards bringing drugs into the prison himself selling. So, obviously, the government in their normal mantra when there's a Brady violation is, yeah, we made a mistake, we should have turned it over, but no harm, no foul. Why is it material? Excuse me? Why is it material? It's material because the cornerstone of their investigation and prosecution of Mr. Young was that he was the one trafficking drugs at Ely State Prison. Well, was it ever the government's theory that he was the only one? I think that if we would have been able to explore the connection between Alvarez and the guards, I mean, obviously, this methamphetamine was not produced inside Ely State Prison. It was brought in by this guard that they prosecuted interestingly after the fact. Now, the government, they had a state official as a case agent, William Ruppert, who himself was convicted after our trial for drugs. They conspired the state officials to prosecute the guards after our trial. If Mr. Young, if we would have known ahead of time that the guards were the ones bringing in the drugs, we could have presented a better defense and called these guards and either they would have taken the fifth or some of them would have testified about other guards and confirmed our belief from the beginning that it was the guards and Michael Alvarez bringing the drugs in to sell. Mr. Young selling the drugs, and I think that is the crux of the Brady violation. This is a constant pattern in the District of Nevada, Brady violations, and unfortunately, it's this court and your honors that are the only ones that can enforce Brady and keep the District of Nevada Department of Justice in line, and this is just another instance where they failed to do it and they've come to this court and said, well, no harm, no foul. Counsel, you said in your comment a minute ago that the government had come forward and said, yes, this should have been produced. Excuse me? You said a minute ago, if I understood you correctly, that the government has now admitted, I think you used the word admitted, that this information about Mr. Alvarez should have been produced. I think they've admitted that this is something that should have been disclosed. I think they talk about that in their brief, that obviously if one of the key witnesses in their case against my client was involved in the same state officials that were there in the courtroom testifying, one was a case agent, and they failed to turn over this investigation that they'd done, they were obviously aware of it. My question is just, do I look anywhere else other than their brief for that concession? I think you just look at the brief, Your Honor. I think that's enough. Thank you very much. And I'll submit it. Thank you. Mr. Littman. Good morning, Your Honors, if it pleases the Court. If it pleases the Court, I'll begin. I represent Mr. Crum. I have two preliminary important points that I want to raise with the Court. The first is an errata that I found in my reply brief, and it references on page 10 an ER which references a particular exhibit. If you were to look in the ER on page 10 for ER 313, you wouldn't have found it. It is actually the GER, the government's excerpts for that reference, so that's the first thing I'd like you to note if you are looking to find that excerpt. The second and very important fact is that the briefing that I did did not include a very important case that assists the defendant in this case, and that's the Supreme Court case of Allain. I'm sure Your Honors have heard of it, and it is right on point as it relates to this case. It should have been mentioned in the brief, but it basically states that any element of the crime that elevates a mandatory minimum ought to be put to the jury. And so there's a violation of the Allain test by the Court in the provision of the amount of the drugs. When was Allain decided? 2013. When was the trial here? 2009. I understand Allain is not retroactive. Is that right? I think it just confirmed cases that were already determined by even this Court that had ruled that even nine years ago. It was just an enunciation that I think there's a Ninth Circuit case that I could find, but it basically affirmed that this isn't something that this Court hasn't disagreed on. I mean, the Supreme Court doesn't take cases just to affirm well-established principles. No, but I don't think that this case has ever been in defiance of any Ninth Circuit law. My understanding is there are cases that say that this principle is not retroactive. If I'm wrong about that, I want to be corrected because I don't want to go off on a tangent. The first instance was in the briefing that there are basically errors in the calculation of the sentencing guidelines. Which they concede, I take it, as to your guy. Is that right? Yes, and that's all I'm here to argue today is those crumb sentences and those are found in the – what the judge did was he escalated the finding of 290 grams of meth to my client when the jury had in fact found less than 50 grams. He came up with some reasoning in his sentencing. He followed the PSR, right? He followed the PSR, yes. Okay, and what about our case law that talks about enhancement being permissible as long as the judge finds it by preponderance of the evidence even though it's acquitted conduct? What about that? Right, and I address that in saying there was no evidence. First, he didn't mention a standard. Secondly, what was the evidence? He just said that the evidence at trial was that Crossman had sold 290 grams, but that wasn't at trial. There was no evidence presented to the jury. In fact, the jury found less than 50 grams probably because there was no evidence. Well, there's evidence that Calabresi said that he and your client were cooking meth. Calabresi never said – Cooking and using meth. They used meth, and Calabresi, who was – And then can I just – here's where I'm going, so I want to give you a chance. I think they've got that snippet. I agree it's not strong as to your client. There's that, and then there's additional testimony about the amount of precursor drugs that were located. Why wouldn't that be enough? Well, the evidence of Calabresi was – No one had mentioned that he was ever involved in cooking or involved in – Calabresi said he finished once while they were high. Finished up for Tony one time at the house. Yeah, and we don't know what – does that mean washing the dishes? What does that mean, finishing? Nobody had ever mentioned that Mr. Crum was ever a cook. The police investigated him. There was no evidence of this. The only evidence came from a letter from Sellers that he was the best cook in the country, but Sellers was in jail and has some mental problems that were addressed in the trial. What about the testimony that's really highlighted more in connection with the gun enhancement concerning that that transaction, meaning the purchase of the gun, happened when they were cooking and using meth? What about that? Well, Mr. Crum attended with Mr. Morgan for that gun. They had tended back and forth between themselves many times before. Mr. Crum was merely there. Forget the gun. I'm talking about that evidence vis-à-vis this enhancement regarding cooking, evidence that your client was involved in manufacturing. Well, there is an evidence that he was involved in cooking. He was there getting high. What about this testimony, counsel? That's what I'm trying to get you to focus on. Of Calabresi? Yes. If the gun transaction happened while they were cooking and using, that's what I'm trying to get you to respond to, please. Yeah, and I think he said that at one time he had finished, or I think that was the testimony, although that had never been stated before. It was stated at trial, and I think it was cross-examined in the trial, that it had never been in any of his previous records. He had never before this statement ever said that Crum was involved in cooking, and at trial he testified that he had assisted in. Now, you would think if he was a cooperating witness and prepped by the government, he would have provided that information much in turn. Thank you. Thank you. I see my time. Mr. Stolworthy, I think you're next. Good morning, sir. Good morning. Thank you. I represent James Wallace, and I just want to talk for a couple minutes about his sentencing issues. And Mr. Wallace was sentenced to 300 months, 25 years, 240 months for count one, 60 months for count two. The judge in this case had 120 months run concurrent to the state sentences. Mr. Wallace was at that time serving, had 32 years remaining on his state charges before he'd be eligible for parole, approximately 32 years. But that 15 years were to run consecutive, which would make him approximately 100 years old when he got out of prison. I raised it with the court, the age factor and the life expectancy factor, which basically are the same in my mind. The court did not consider the age or life expectancy factor. He said it would lead to disparate sentences. He said he was not aware of any authority with regard to life expectancy issues. We argued that there was authority, that the 3553 factors is the age policy and 5H1.1 of the sentencing guidelines. We just felt like there should have been a finding with regard to his age. It's a pertinent issue. It's basically a life sentence to him. What would you have him find? I mean, the facts are the facts. He's whatever age he is, and you can do the arithmetic. What's he supposed to find? Well, part of the public policy argument was that the recidivism declines with age, that it's sharply lower for persons after age 70. I mean, by that logic, nobody could get life, right? Well, he wasn't supposed to be sentenced to life. No, what I'm saying is if you're saying just because you're going to die in prison, you can't be sentenced to a long term in prison. By that logic, nobody could get a long sentence. I understand what you're saying, but this wasn't the crimes that he was convicted of weren't really life sentences. That's not what the sentencing guidelines were proposing. It's just when you juxtapose that with his remaining state sentence. What were the guidelines for Mr. Wallace? Well, in his PSR, his guidelines were the judge sentencing within the guidelines. That's correct. Yeah, he did. But that's my argument. Okay, fair enough. Thank you. Thank you. Mr. Marcello. Good morning, Your Honor. Dustin Marcello, if it may please the Court, on behalf of Charles Gensimer. And, Your Honor, I'd like to jump straight to the first topic, which is the Lafleur issue that we had addressed in our motion. The issue with Lafleur and how we approached this problem when we asked for, essentially what we're asking for is relief of specific performance of the plea agreement as it relates to the co-defendants who agreed to accept the pleas prior to trial. This case started with 14 individuals. By the time of trial, there were six left. Five of those on the day of trial had accepted a contingent plea negotiation. I'd just like to give a brief example from – there's not very much case law, as we noted both in the government's brief and ours, with regards to this specific issue as it relates to package plea negotiations. Can I – forgive me for interrupting, but is there anything – is your position that there's anything improper about the government's offer? I mean, if we want to talk from a legal precedential standpoint, the Supreme Court has said that they are reserving any constitutional issues they may have with package deals. But there is nothing that has said that package deals in of themselves, by themselves, are an inappropriate procedure or process. I don't think so either. So now be quiet and listen because I just want to make sure that I check that off the list. So go ahead. So then the issue becomes, well, what do we do when we have a situation where a co-defendant refuses to plead guilty and how that affects the remaining defendants? Again, there was one case that I found from 2012 that I could provide the court. However, it was a Pennsylvania state court case that had unusual effects, and I just want to give the scenario that was used in there. Two people, individuals, are involved in a murder, the shooter and the person with them. The shooter is facing a death penalty. The person with him is not. The shooter gets offered a deal of life without in exchange for a contingent plea by both defendants. The co-defendant refuses to accept the plea. His co-defendant could be considered responsible for his co-defendant's death. If he does not accept that plea, he will ultimately be sentenced to death if he is convicted. I can imagine a circumstance like that where the death penalty is at stake, where the equation is really different. And I apologize. That's not here. We don't have that here. What you do have, though, is you have at least two defendants who, by all accounts, will most likely die in prison. Both Charles Gensiber, my client, and Mr. Wallace as well. I mean, by all accounts, based on when the projected dates and their current ages when they were convicted, may die in prison. Does your argument hinge on us finding that there was ineffective assistance at counsel as to Yoast? There's two bases that you can use to both grant the relief requested. One is this idea of ineffective assistance at counsel for Yoast. Now, the government has conceded that, in fact, he did receive a longer sentence than he would have received. There's a standing problem with that, right? Well, here's how we address the standing problem, and we'll start with Yoast first. The government has basically said that he received ineffective assistance. They just argue whether or not he was prejudiced because they say he wouldn't have accepted the deal. Well, he said that quite adamantly. In the affidavit, again, when he made that original statement, it was under his misunderstanding of what the law was and what his involvement was in the RICO conspiracy as apart from the drug conspiracy. We don't know yet, do we, that he would have accepted the deal had he been given proper advice. Is that right? No. He submitted an affidavit with our motion for specific performance that indicated I would have accepted the deal, or at least I would have considered it and accepted the deal if I would have known that I could be found guilty of a drug conspiracy but not a RICO conspiracy. Do we need findings of fact on that? What's that? Do we need findings on the IAC claim about what would have happened? I don't believe so for relief for the rest, and I'll get to the second prong or second reason why. But as it relates to Yoast, absolutely, and there was no fact finding. The court had made the decision that he wasn't prejudiced because he received an erroneous decision because he received the same sentence he would have received. The government indicates that that was erroneous. However, the question then turns, well, then, what is the prejudice to him? And his prejudice, he had filed an affidavit, which is the only uncontroverted statement that he would have considered the deal and would have accepted it had he known this legal issue and been properly explained to him. Now, there was an affidavit filed by his counsel, but it was after the court's decision was made, so it couldn't have been considered as part of the decision. And based on that, we believe that he then may have a colorable claim for receiving assistance under Lafler. Now, as it extends to the rest of the co-defendants, you have a package deal negotiation, and this is where I was going to get to with regards to standing. The idea of ges-terti, you know, that you can't assert the legal rights, if we're going to analyze these as some type of contractual law for plea agreements, then where we have to start is that Gensimer, my client, as well as the other co-defendants that were willing to plead, they become third-party beneficiaries of the contract that's offered to Yoast. I mean, I apologize, to Yoast. Let me just skip ahead for a second. I, for one, am sympathetic to your argument that for whatever reason the government put them in the same boat, and there are advantages to that and there are disadvantages to that from their point of view, and one of the disadvantages is the one we're talking about now. My question is, I don't really see how we can say that Yoast received ineffective assistance counsel, which includes the second prong of prejudice without a hearing. I mean, Yoast may have put in whatever affidavit he put in, but I mean, you know, we need to hear from the lawyer who will say whatever he's going to say. You know, the guy was adamant he wouldn't have pled guilty no matter what or whatever. I mean, the judge needs to make that determination, and all we have is I guess it was Judge Dawson concluding there was no prejudice because he got the same sentence he would have gotten anyway, which we now know was incorrect. And I completely agree with that, and that's why I put in the brief that it was error not to grant the evidentiary hearing and establish that fact when at the time you had at least some information in the affidavit that was uncontroverted at the time to at least— That's the relief you're requesting. Or Mr. Yoast, yes. To have a hearing. To have the hearing to establish the prejudice prong in that he would have accepted the negotiation consistent with his affidavit that's already on file. Now the final issue, and again I want to jump to this, both the courts and the co-defendants are third-party beneficiaries to that contract of the plea agreement for Yoast. The court, as I noted, wanted to conserve resources. This was a nine-week trial. We have four attorneys here. There was hundreds of thousands of dollars, if not millions, spent on this trial. If the court has the authority to join defendants together and sacrifice some constitutional issues in the joinder based on judicial economy and the idea of conservation of resources, then they should, in the interest of justice, have the right to excise certain terms of the contract that are inconsistent with the interest of justice. And if they want to look at it as a third-party beneficiary, both Gensimer and all the remaining co-defendants who received nearly double sentences as compared to what they would have received under the plea agreements, then they become third-party beneficiaries and should have some amount of standing to challenge if there was some irregularity or some reason that their co-defendant didn't accept that was out of their control. Are you arguing third-party beneficiary, or are you arguing that the court should have had the ability to alter the government's offer, to excise a portion of the government's offer? I'm hearing you say both. Yes, we are arguing both because there is no extension of the law in here. I want to provide with all both logical and both what is consistent with what I think is the interest of justice to achieve the result, which is, listen, we have these plea agreements. The court in Lafler has said we have a system of pleas, not of trials. We can no longer rely solely on a completely valid trial to determine whether or not the actual plea may have been valid. And now that we have these interest of justice issues, it should be up to the court whether or not it is within the interest of justice to excise the portions that may offend the interest of justice. Thank you. Thank you. Good morning. Good morning, Your Honors. And may it please the Court, I'm Nina Goodman on behalf of the United States. I'd like to address the issues that counsel raised and answer any questions the Court may have. On the Brady claim, on behalf of Mr. Young, the evidence, the information that should have been turned over was that Mr. Alvarez had provided the name of a Nevada corrections officer. The evidence was that this information was provided voluntarily. It was correct information for no benefit, no, there was nothing given to Mr. Alvarez in exchange for this. Is opposing counsel correct that the State has conceded that should have been turned over? Yes, that should have been turned over, but the district court correctly, clearly found that there was no possible prejudice. And it's important to look at everything that was turned over about Mr. Why wasn't it? I know what, I think I'm pretty clear about why the court found that this didn't matter in the sense that it wasn't material within the meeting of Brady, but why wasn't it turned over? I think it was inadvertent that this was a very brief period when Mr. Alvarez told his wife, oh, tell them there's this dirty corrections officer. He was then immediately transferred to Federal custody, Mr. Alvarez was, and that it was just an oversight. That's, the record doesn't reveal anything beyond that. But Mr. Alvarez's trial was very, very extensively impeached. He admitted in his testimony he was a snitch and a rat, and he was. He was a long-time cooperator. He had cooperated with State authorities and Federal authorities. He had received extremely extensive benefits. He had lied to a Federal grand jury. This is the part I think we do know. Okay, so it was completely cumulative, Your Honors. And I'll get off of that. On Mr. Crum's claim relying on a lien, which I believe he raised that case to some extent for the first time here this morning. But just to answer Your Honor's question, a lien is a constitutional decision of the Supreme Court that is retroactive in the sense that we're not talking about, it's retroactive to this case because it's on direct review. It's not on collateral review. The pipeline, these cases were in the pipeline? Yes, Your Honor. That is correct. But a lien has nothing, even if he had raised it before this point, it has nothing to do with this case because the jury's findings set the maximum and minimum sentence and then the additional findings of the district court within that range by a preponderance of the evidence, that standard practice has continued to apply and this court and others have held it continues to be constitutional. It is concerning, counsel, before you skip too quickly over this issue, the jury was given essentially a drop-down menu and they could have found this, a quantity, quantity A or quantity B or quantity C, and they found it the lowest quantity as to two of these defendants, I believe. Or maybe that's not quite right. But anyway, a lower quantity. And the judge then, having been asked the question, beyond a reasonable doubt, they found quantity A and the judge found quantity B by a preponderance of the evidence. Are you relying, are you just relying on our Ninth Circuit authority? Well, Your Honor, I'm relying on Ninth Circuit authority and Supreme Court authority. The Watts case has never been overruled and that, and it continues to be good law that is binding on this court. And Justice Scalia has taken a couple of runs at that, as we all know. And so what is your argument? I really would appreciate hearing your argument about, because they're telling us, we should encourage our colleagues to take this en banc because it's a troubling, a concerning issue. It's an issue that actually is resolved, we believe, number one, by Supreme Court precedent, by the Watts case. And we would continue to rely on that inconsiderate binding on this court. The court, obviously, Apprendi, Alleen, all the cases that have come in, and the Supreme Court has repeatedly been asked in petitions for certiorari to reconsider its holding in Watts and has not done so. And we think that law is still binding. The underlying rationale is the difference, as Your Honor suggested, between a beyond-a-reasonable-doubt standard and a preponderance-of-the-evidence standard. And there's no conflict. But if I were the person sitting in the jail cell, I'm not so sure I would agree with you, because the ultimate difference, after applying this enhancement, is more jail time. That's right, Your Honor. And it illustrates that the juries under the Supreme Court's cases, including the Alleen case, the jury's finding sets the maximum and minimum, so that you cannot serve one day more time than the maximum that is authorized by the jury's verdict. And so the reason you think this is okay in this case is because it didn't exceed the maximum. I'm just going to finish your thought. Correct. It's the Supreme Court has repeatedly said in all of its constitutional sentencing cases from Apprendi on, is that in setting the judge may make findings in setting the sentence within that range. And that includes the guidelines determinations that are probably made by a preponderance of the evidence. Thank you. Can we talk about the ineffective assistance of counsel issue? Yes, Your Honor. Do I understand correctly that when this was raised by Yost, the district judge said, regardless of what counsel did, there was no ineffective assistance of counsel vis-a-vis Yost, because Yost got the same sentence he would have gotten had he accepted the deal? Yes. And that was an incorrect finding. If I could just point out one thing on the record. The affidavit of Mr. Yost's former counsel, Mr. Myers, was actually filed before the decision as to Yost. Okay. But the judge never got there because he said there was no harm, no foul. He got 120 and he would have taken 120. I mean, he was offered 120 and he got 120. And the problem is he really got 168. That's right. So why right off the bat don't we have to send that back for the judge to consider whether Yost suffered ineffective assistance? Well, Your Honor, ineffective assistance of counsel determinations are reviewed de novo by this Court. So we don't, it's not really a factual finding in the sense that the Court is supposed to review a finding for clear error, but also it's. We don't know all the facts. Well, Your Honor, I would respectfully disagree in one respect. The record that's before this Court is exactly the record that would be before the district court. Well, did the lawyer testify? The lawyer said, Mr. Myers. Well, no, no, no. My question is did he testify? Was there a hearing?   It was all affidavits. That's right. So there hasn't been a full exploration of these contentions. I mean, we don't know exactly what they're going to say or what the judge will find or believe. We don't know exactly what they're going to say, and we do believe, however, if I could just point to two post-verdict findings, filings, excuse me, by Mr. Yost. It's important to remember exactly what Mr. Yost is claiming is the ineffective assistance here. He's saying, oh, my lawyer, Mr. Myers, told me that because I was not guilty of the RICO conspiracy, I couldn't be convicted on the drug conspiracy. I mean, Myers' affidavit says we never talked about pleas. He insisted from the beginning he didn't want to take a plea. Well, he says, well, but that's because I was given this bad advice. But then the jury verdict comes down. And, in fact, Mr. Yost is acquitted on the RICO, and he is convicted of the drug conspiracy. And he continues in two filings after that verdict to say, I would never take a deal, he says, in his first filing, which was when he was trying to fire Mr. Myers. He says, I tried to get Myers to make this argument. And Myers responds and says, no, that argument is unfounded. It's without basis. Then two years later, he's trying to fire the next lawyer that he has. And he says, this guy, this new lawyer, Mr. Bowers, I believe his name was, is just trying to get me to take a deal. And I've told this court I will not ever take a deal. He's continuing to make these statements, which are consistent with Mr. Myers' affidavit that he said from the beginning, no deals, no deals, no deals. You're asking us to weigh the evidence. You're asking us to make a finding of fact, and we're circuit judges. Your Honor, I disagree with the court that it's a finding of fact. Could I get to a different point? Because I don't think you've addressed this, and it really goes to Judge Silverman's point, which is we have considerable case law talking about the fact that we don't really do IAC, typically, unless it's on collateral review. But here we are in direct appeal. So there are several things about this that feel like a square peg round hole. So why would we do this now? Why would we address this claim on the merits? Well, Your Honor, they raised it in a the defendants raised it in a new trial motion. And I think that the appeal from that motion is probably before the court.  Sure, but it's one thing. It's one thing. They're not the first defendants to do that. But it's one thing for us to deny that, the motion for a new trial, and quite another to reach the merits without a developed factual record. Well, the appeal here is from the denial of the new trial motion. But, Your Honors, can I explain why, if the court – may I please make my argument why, if the court does think that a remand is warranted on this issue, it should not apply to the other defendants besides Mr. Yes, but just so you don't lose my – so you understand, I'm not suggesting that. My question is why wouldn't we affirm on this and wait for it to come up on collateral review? Well, Your Honor, that would certainly be appropriate, because a full record could be developed on collateral review. That's typically, as Your Honor notes, where these types of claims are raised. And then the judge would have the opportunity to hold an evidentiary hearing and to make a correct ruling on the entire record. So we do think that's – I wanted to make a different point, and I'm using up your time, so – That's okay. Okay. Thank you, Your Honor. The reason that the other defendants other than Mr. Yost are not entitled to relief is that no right of theirs has been violated. And there are two reasons for that. I mean, it's as simple as that. They don't have a right that's been violated. It's clear that by being offered a package plea, you don't have a right to – each lawyer doesn't suddenly become the lawyer for the other defendants. None of these defendants, other than Mr. Yost, claims that his lawyer was ineffective, that he was incorrectly advised, that he relied on – somehow relied on Yost Counsel's  What you're saying is that you put them at the mercy of the other – of the other defendant. Well, Your Honor, I'm just saying that the Sixth Amendment right to counsel, as this Court has said and other courts have said, is a personal right. It applies to you. But, Counsel, this is an important point. And there's Judge Silverman's point, which is that the other defendants were absolutely unable to accept the offers that had been extended to them. And, no small thing, there was a multi-week jury trial that had to happen that inconvenienced a lot of people and cost a lot of time and money, I think just because of the nature of the offer. Isn't that right? Well, Your Honor, the – no. This is – I don't think that's right. The first – the first point to be made is that it wasn't like these defendants – there's no evidence in the record to suggest that these defendants were somehow barred from earlier in the case. In fact, Mr. Young did enter a guilty plea and then withdrew it. So it isn't like the government just decided two days before trial, oh, we're going to let you guys plead, but here's the offer. And the other thing is, the evidence in the record, based on the statement of the prosecutor as an officer of the court, was that the reason the package plea was offered at this because of security considerations, which were extremely serious in going to trial on this violent conspiracy of gang members, and that it would not – those concerns about the cost of providing security for the trial could not be addressed unless everyone entered a guilty plea. But the other reason the defendants at this point are saying, oh, but we were denied a plea offer. And what they're really asking the court is for an offer that the government is to say the court's got a right in this new provision and say, yes, you get to take this offer, even though Mr. Yost turned it down. So you're going to get the plea that the government never offered. And the law is clear that defendants don't have a right. There's no constitutional right to a particular plea offer. You have a right to be correctly advised by your counsel, which they were, about the plea they were offered. But there's no right to go back and say, oh, my goodness, the trial didn't turn out the way we wanted, so now, you know, we want this plea offer. Somehow we had a right to this plea offer. That's never been the law. I don't know of any case that deals with this particular scenario. Do you know of one? No, Your Honor, I do not. But it seems to the government to follow directly from the principles that ineffective assistance of counsel is a personal right and that there's no right. So they did receive effective assistance of independent counsel. To suggest otherwise would mean that somehow when there's a package plea offer, which is permissible, that somehow there's a right to have the other defendant's interests, and that would obviously be contrary to everything we know about effective assistance of counsel. I'm sorry. I didn't follow your point about the security concern. This is probably neither here nor there, but if Wallace, Gensimer, Young, and Crum had pled guilty ahead of time, what would have been the, and only Yost goes to trial, what's the security issue? Well, this was a trial where what was alleged was a violent conspiracy by white supremacist gang members. I understand all that, but why is it any more of a security problem if all of them are in trial together or if only one is on trial? That was the point, Your Honor, that the government, the reason the government offered, gave afterwards, that the reason the package plea was offered was that the security concerns would not have been mitigated unless all of them pled. But surely that can't be right. Surely the trial would have been, if nothing else, much shorter. Well, I mean, Mr. Yost was tried for both the entire RICO conspiracy and the drug conspiracy. I mean, he was acquitted on one, convicted on the other. And so it's hard to say at this point, Your Honor, but that was the reason in the record. It wasn't that the government decided. I just want to make sure I understand. It's hard for me to get my mind around why it would have been more of a security problem to just have Mr. Yost as the only defendant instead of four other guys with  him. No, Your Honor. I think I may not have stated it well. I think the this was the government's reason for offering the plea as a package. I think you might have stated it backwards. In other words, it wouldn't have been any less. It wouldn't. You would still have had to go to all the expense. Correct, Your Honor. That's how I'm trying to say it. The same expense would have existed unless the trial was just not held at all because of the nature of the evidence, the allegations, and the witnesses who had to be brought in from all over and the very heavy security concerns. I'm happy to address Mr. Crum's sentencing points about the evidence. I just wanted to make one point, actually, about that. There was evidence that Mr. Crum himself was cooking methamphetamine, and that was from Mr. Calabresi. And on redirect examination, he was asked, well, how do you know Crum was cooking? And he said, from his own mouth, so that Crum had told him that. But there was also evidence that Crum participated in the it was present for and participated in the cooking of methamphetamine, at least on one occasion, or the finishing at the Helm Street address where Mr. Gensimer's lab was. And I'm happy to address the evidence about the firearm enhancement. I think it's covered in our brief. Was there evidence that Crum stayed at the Helm Street house? No, Your Honor. I don't think there was evidence that he stayed there, but he was present there while methamphetamine was being cooked. And Mr. I think it goes, just so you know where I'm headed with this. I think opposing counsel, it goes to the quantity issue and how much can fairly be attributed to him as a member of the conspiracy. Your Honor, if I can address that, the quantity that was attributed to Mr. Crum was not based on the Helm Street, the Helm Street laboratory. That was actually based on while Mr. Crum was out of prison, he was cooking methamphetamine and he was living with, to some extent, associating very closely with a man named Crossman, known as Lopes. I remember now. Yes. And Mr. Sellers, the head of the gang, was setting up drug deals from inside prison. But what about the fact that the government has now, I mean, the jury was given the choice and as to some of the defendants, they found a higher amount, but not as to him. They found a lesser amount. What about that? Well, Your Honor, it's, as the court and courts have said many times, you can't really, the jury, there's no reason that can be given. I mean, it's sort of like an inconsistent verdict. Obviously, it's not. But it's, you can't say why the jury did not find the higher quantity. But again, I just go. The reason it's troubling a little bit is if you couple it with the court's mistake, I think you've conceded, the court's mistake in deciding that he was also an organizer. Well, but Your Honor, the organizer thing was not something addressed by the jury. But, yes, I appreciate that, counsel. The point I'm trying to make is it's consistent with the judge. I mean, there were a lot, this is a cast of many characters, and it's consistent with a mistaken understanding of sort of how Crum fit into the overall scheme if he's been given more responsibility for being an organizer and perhaps more responsibility for more meth. Would you like an opportunity to respond to that? Yes, Your Honor, I would. The amount of drugs was not based on a large global conspiracy or an amount of precursors or any of that. It was based on two very specific deals arranged by Mr. Sellers from in prison in which he, and letters were exchanged back and forth, two specific sales of amounts of drugs by Mr. Crossman, who was working closely with Mr. Crum, to a government agent known as Hornet. And so I understand the court's concern that he's being attributed with a broader conspiracy, but that was not the evidence that this was based on. Thank you, Ms. Goodman. Thank you, Your Honor. I believe Mr. Littman had reserved rebuttal for the group. Thank you, Ms. Goodman. Mr. Littman, you're up. The concern, if you don't accept the Alleen case as being affirmative on this matter, goes to the issue that the government has continued to raise through their briefing before you today is the preponderance of evidence. There was no evidence. There wasn't even a—they used the preponderance of evidence. There was no clear and convincing evidence. She stated that the judge found that there was this conspiracy with Crossman. We don't know that. The jury didn't affirm a conspiracy with Crossman. There was no evidence before the jury about Crossman's deal. The judge did not—the only evidence before the court with Crossman's deal was a plea agreement where he had pled to that before. That wasn't before the jury. The judge just said in the hearing and didn't apply the analysis that it ought to use. There's no reasoning. When she says they found a preponderance of evidence, there's no standard stated by the judge as to what he used. He just pulls a piece of evidence. Well, the relevant conduct is the 290 grams, and that's how he came up with the—over an amount. The jury had not—did know not anything about any amount of drugs. And so just the method by which the judge used was wrong procedurally and ought to be reviewed. There was no reasoning given for those findings in any of the enhancements, no preponderance of evidence or clear and convincing evidence. One final point. Your Honor raised the issue of the enhancement for the cooking and mentioned that he was there. One of the things that we've stated and continue to argue, the jury didn't find a conspiracy with Calabresi. There was no charges with that. That wasn't—in fact, we don't even know who Crum had conspired with in the terms of the finding. That isn't clear from the record, who was his co-conspirators. But in any event, the court—I mentioned in the brief that the judge failed to apply the mandatory test, which was in the U.S. 2D 1.1 applicable notes 20, which states the factors the court should consider when deciding a substantial risk of harm must include A, B, C, D, and E, the location, the time, the toxic waste disposed. As mentioned in the brief, there was no evidence given of all that.  Which was, I submit respectfully to trial judge, was the basis of all his findings of enhancements. Well, that's not a compliment. I'm sorry? That's not a compliment. No, no, no. Okay. Thank you very much, Mr. Goodman. Gentlemen, thank you. Ms. Goodman, thank you as well. The case just argued is submitted and will stand in recess for today. All rise.
judges: Duffy, Silverman, Christen